ORIGINAL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FILED
JUL 30 2004
U.S. COURT OF FEDERAL CLAIMS

RESEARCH & PROFESSIONAL SERVICES,
22963 West Outer Drive
Dearborn, MI 48124

Plaintiff,

v.

THE UNITED STATES OF AMERICA,

Defendant.

Case No. 04-1232C

**COMPLAINT**

Plaintiff Research & Professional Services (RPS), by counsel, as and for its Complaint against the Defendant, the United States of America acting by and through the National Aeronautics and Space Administration, avers as follows.

**JURISDICTION**

1. This Court has jurisdiction over this matter pursuant to the Tucker Act, 28 U.S.C. § 1491. RPS brings this action pursuant to the Contract Disputes Act of 1978, 41 U.S.C. § 601 et seq. (CDA).

2. Pursuant to the CDA, 41 U.S.C. § 609, RPS brings this action directly to the United States Court of Federal Claims within 12 months of the receipt of the Contracting Officer's Final Decision by RPS.

## PARTIES

3. The Plaintiff, RPS, is a sole proprietorship located in Dearborn, Michigan, which provides research and development services to government agencies and business. Although highly skilled in the areas of technical and engineering research services, RPS was a small Section 8(a) company under the Small Business Act during performance of the contract at issue in this case. RPS has since graduated from the Section 8(a) program.

4. The Defendant is the United States of America, acting through its agency and agent, NASA/Goddard Space Flight Center (NASA).

## NATURE AND SUMMARY OF ACTION

5. This action is brought by RPS to recover indirect costs and fees incurred (and earned) in performing a cost-plus-fixed-fee level of effort contract to provide technical and engineering research for NASA. The bases of entitlement include 1) RPS's indirect cost overruns were unforeseeable, and therefore are recoverable under the terms of the Contract; 2) the cost overruns were due to a breach of the Contract by NASA, and hence are compensable to RPS, and 3) the cost overruns are due to a constructive change to the Contract, in that NASA ordered significantly fewer direct labor hours as compared to the Contract minimum level of effort, and by reducing the direct labor base in this manner NASA necessarily increased RPS's indirect cost rates above the contractual limits. RPS seeks payment of $283,193.07 as matter of right, plus interest allowed per the CDA.

## STATEMENT OF FACTS

6. In late 1992, RPS negotiated with NASA a cost-plus-fixed fee contract, No. NAS5-32333, to provide technical and engineering research services for one base

year, with a two year option period (the Contract). The Contract was a set-aside under the Small Business Administration's Section 8(a) program, and was RPS's first contract with the Federal Government.

7. During negotiations, the Defense Contract Audit Agency (DCAA) established an estimate of costs for performance of the anticipated work, and using this estimate set the rates for recovery of G&A and overhead expenses for the life of the Contract. These rates were included in the Contract at Article B.3, Limitation of Indirect Costs, which established reimbursement rates for RPS's overhead and G&A expenses to be applied to RPS's total direct labor expenditures and total costs, respectively, as follows:

| **Indirect Cost** | **Base of Application** | **Percentage and Period of Time** |
|---|---|---|
| Overhead | Total Direct Labor | 51% duration of contract |
| General and Administrative Expense | Total Cost | 13.91% Basic year<br><br>13.98% Option first year (if exercised)<br><br>13.82% Option second year (if exercised) |

Article B.3 also provided that "The indirect cost limitation(s) set forth above consider all known costs that will occur during the term of this contract."

8. The percentages established as limitations on RPS's indirect costs were based on NASA's estimates for the amount of work it would order over the life of the Contract, as well as estimates of the type and amount of labor the work would require. In

the negotiations between RPS and NASA there was very little discussion of the rate caps, and NASA's Contract specialist made it clear that the matter was not negotiable.

9. In addition to the Limitation on Indirect Costs clause, the Contract also contained Article C.4, "Level-Of-Effort (Cost)", which established the "total direct labor hours" for the base year of the Contract at 46,653 hours, and specified that RPS was obligated to provide "not less than" 41,988 labor hours (ten percent less than the total) "nor more than" 51,318 labor hours (ten percent more than the total). Article C.4 also nominally allocated the anticipated labor hours among RPS's labor categories, but allowed RPS to vary the skill mix.

10. By agreeing to the above Level-of-Effort and Limitation of Indirect Costs provisions, the parties contemplated that RPS would allocate its anticipated overhead costs across the anticipated base of direct labor hours, and recover them at the percentage rate applied to the direct labor costs RPS billed under the Contract. Likewise, RPS agreed to recover its anticipated G&A expenses as a percentage of the annual cost of performance. Implicit in this contractual arrangement was the expectation and understanding of both parties that NASA had to order at least the contractually-established minimum direct labor hours in order for this contractual cost recovery mechanism to work as intended, and otherwise a severe under-recovery of indirect costs would occur.

11. During negotiation of the Contract, NASA emphatically represented to RPS that it should expect work to begin under the Contract in November, 1992. As was well known to NASA, RPS had to employ an administrative staff to be in a position to receive and perform task orders under the Contract. Accordingly, in reliance on the

representations of NASA that award would be made in November 1992, with work to commence immediately thereafter, RPS hired an administrative staff in November 1992. However, after RPS had committed itself financially to these arrangements, NASA delayed execution of the Contract until April 1993, and work did not commence until that time period. RPS thus unexpectedly incurred indirect costs for five months before any task orders were issued under the Contract.

12. After the first year of the Contract, NASA issued a modification to exercise its option to have RPS perform for an additional two year period. The modification also made minor adjustments in the level of effort to be anticipated for the two additional years. The Contract performance period, as modified, ran from April 1993 to March 1996.

13. In 1994, RPS learned that its indirect cost rates were exceeding the allowable rates under the Contract. However, during that period NASA had represented to RPS that it would continue to receive significant amounts of work under the Contract. RPS thus continued to work on the NASA task orders, reasonably anticipating that the future work promised would increase RPS's direct labor base and thereby reduce the indirect cost rates to within the contractual limits.

14. Over the course of Contract performance, NASA materially failed to issue a volume of task orders that would generate the minimum labor hours contained in the Contract. Instead, NASA issued modifications to the contractual work scope that had the effect of reducing the task orders issued to RPS. This resulted in a loss of direct labor hours and revenues to RPS, resulting in a substantial increase in RPS's overhead and G&A rates (as a percentage of direct labor expenditures and total cost). Also, the nature

and type of work issued in task orders by NASA required a lower caliber of staff than anticipated, and hence in the short run RPS was forced to perform work with higher caliber, and therefore more expensive, staff than would otherwise have been the case. These NASA changes to the Contract work had the effect of decreasing RPS's direct labor hours below the Contract minimum, and significantly increasing its indirect cost rates as a consequence.

15. All work was properly and timely completed under the Contract by March 1996. RPS had not realized the extent of the cost overruns at that point, however, because the RPS's fiscal year ends in December, and the final indirect cost rates were not known at that time. When the final rates became known some months later, by letter dated August 23, 1996 RPS notified the NASA Contracting Officer of the cost overruns and requested an adjustment to the contractual indirect cost limits to permit recovery of these unforeseen costs.

16. By letter to the Contracting Officer dated August 23, 1996, RPS requested payment of the total allocated fixed fee of $138,458, even though NASA had assigned, and RPS had completed, only 85.49% of the total level of effort originally estimated for the Contract. RPS explained in this correspondence that the lower level of effort was due to NASA changes to the Contract work in 1994-1995, and that it would be inequitable not to provide RPS with its full compensation for work efficiently and well-performed.

17. The Contracting Officer did not respond to either of RPS's letters. On March 6, 2000 RPS submitted a completion voucher and related closing documents stating that RPS's actual costs of performance were $2,091,776. This represents an overrun of $260,017.80. DCAA subsequently audited RPS's statement, and on March 9,

2000 submitted an audit report to NASA concluding that RPS's costs were allowable under applicable cost principles, but were not payable due to the cost limitation clauses in the Contract.

18. Following additional exchanges of correspondence with NASA, on November 7, 2002 RPS submitted a certified claim to the Contracting Officer for a final decision under the CDA. At the Contracting Officer's request, by letter dated January 24, 2003, RPS specified the amount of its claim at $283,193.07, which represents the sum of $2,101.96 (costs recognized by the Contracting Officer but not paid), $260,017.80 (cost overruns due to decreases in direct labor hours and concomitant increases in indirect labor rates), and $21,073.31 (unpaid fixed fee). RPS also recertified its claim in accordance with the CDA.

19. After granting itself several extensions of time, by letter dated July 31, 2003 the Contracting Officer issued its final decision denying RPS's claim in its entirety.

**COUNT I**
**(Unforeseeable Cost Increases Are Not Barred By The Contract)**

20. Paragraphs 1 through 19 are incorporated herein by reference.

21. RPS is entitled to reimbursement of its actual costs incurred during its performance of the Contract because while NASA could well foresee that RPS would not be able to work enough direct labor hours to absorb its indirect costs at the contractual rates -- because NASA did not intend to issue task orders ordering work at the levels called for by the Contract -- RPS did not and could not foresee this.

22. RPS could not have reasonably foreseen that NASA would fail to order the minimum labor hours contemplated by the Contract, since the minimums formed the basis for recovery of indirect costs under the Contract. Further, given the nature of most

of the indirect costs at issue, being office leases and administrative staff and other costs that could not be instantly stopped and started, RPS could not avoid the overrun in indirect costs simply by stopping work. NASA was not prejudiced by any lack of notice of such overruns.

23. Given the large underrun of direct labor hours, it would be inequitable for NASA to refuse to grant recovery of RPS's actual indirect costs. Under these circumstances, it is well-established by law that NASA should make payment of RPS's claim for its indirect cost overruns. See Johnson Controls World Services, Inc. v. United States, 48 Fed. Cl. 479, 486-487 (2001); Moshman Associates, ASBCA No. 52868, 2002-1 BCA ¶ 31,852 (2002).

**COUNT II**
**(Breach Of Contract)**

24. Paragraphs 1 through 23 are incorporated herein by reference.

25. NASA's failure to issue sufficient task orders to permit RPS to meet the contractual minimum for direct labor hours was a material breach of contract.

26. Although Article C.4, Level Of Effort (Cost), does not expressly state an obligation on the part of NASA to issue task orders authorizing the minimum number of hours, that obligation is established by necessary implication. Article C.4, Level Of Effort (Cost), taken together with Article B.3, Limitation Of Indirect Costs, requires RPS to work at least the established minimum number of hours, and to recover its budgeted and agreed upon indirect costs at the contractually-prescribed percentage rates. If NASA were under no obligation to issue task orders that generate the minimum number of hours, then this mechanism utterly fails to produce the expected result that RPS will recover the budgeted indirect costs under the Contract. If NASA ordered work that

generated only a few direct labor hours, RPS would incur most of the budgeted indirect costs in any event, but could recover only a tiny percentage of them using the indirect cost rates in the Contract. A contract cannot be interpreted to achieve an absurd result, and this surely is one. The Contract is a "cost reimbursable" contract, and must be interpreted in harmony with the expressed intention of the parties that RPS will recover its indirect costs, rather than perform at a huge loss when NASA does not order the anticipated level of work.

27. The Contract thus established by necessary implication an obligation by NASA to issue task orders that would allow RPS to achieve the contractual minimum. NASA failed to do so, and refused to compensate RPS for the costs it incurred in performing work for NASA. RPS was severely damaged thereby, and is entitled to recover its actual costs of performing the work.

**COUNT III**
**(Constructive Change)**

28. Paragraphs 1 through 27 are incorporated herein by reference.

29. The Contract incorporated by reference FAR clause 52-243-2, Changes – Cost Reimbursement (AUG 1987), which provides that the government has the right to "make changes within the general scope" of the Contract, but if it does it must "make an equitable adjustment" in the "estimated cost" of the work, and in "other affected terms and shall modify the contract accordingly."

30. NASA's representation to RPS in November 1992 that the Contract would be immediately awarded to RPS was intended to induce RPS to hire sufficient administrative staff to commence performance of the work. NASA's representation did

induce RPS reasonably to enter into these arrangements, and this increased RPS's indirect costs above those anticipated at the outset of the Contract.

31. By inducing RPS to prepare to commence work five months in advance of Contract award, NASA thereby constructively changed the period of performance, and the indirect cost rates in the Contract, to accommodate these additional costs. In addition, NASA is equitably estopped to deny payment of these costs.

32. NASA directed changes that reduced the contractual minimums for direct labor hours without also increasing the indirect cost rates to accommodate the direct labor reductions. NASA also failed to issue sufficient task orders to permit RPS to meet the contractual minimum for direct labor hours. These were constructive changes to the Contract, and obligate NASA to equitably adjust the cost limitation clauses in the contract to permit RPS to recover its actual indirect costs. RPS gave all contractually-required written notice to NASA of these changes, and in all events NASA had actual knowledge that these changes would increase RPS's indirect cost rates. To the extent NASA did not receive written notice of these changes, it is not prejudiced because there is no action it could or would have taken in such an event.

33. RPS has given all contractual notices and met all preconditions for suit that are necessary for it to recover the amounts requested in its claim.

34. Accordingly, RPS is entitled to an equitable adjustment under the Changes Article to the indirect labor rates to allow recovery of RPS's actual costs in the claimed amount.

WHEREFORE, RPS requests a judgment in its favor in the amount of $283,193.07 plus CDA interest at the applicable rate, and such other and further amounts as the Court deems just and equitable.

Respectfully submitted,

Brian W. Craver
PERSON & CRAVER LLP
1801 K Street, N.W.
Washington, D.C. 20006
(202) 466-4434 (Tel.)
(202) 466-4416 (Fax)

Date: July 30, 2004

Counsel for Plaintiff

OF COUNSEL:

Dinesh C. Verma, Esq.
NANKIN & VERMA PLLC
11 North Washington Street
Suite360
Rockville, MD 20850
(240) 456-0000 (Tel.)
(240) 456-0002 (Fax)